IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MICHAEL E. DORON, Ph.D., a single man, | ) ) ) | No. 31636-0-III |
| Appellant, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| EASTERN WASHINGTON UNIVERSITY, a state of Washington public four year institution of higher education; UNITED FACULTY OF EASTERN WASHINGTON UNIVERSITY, a public employee organization; UNITED FACULTY OF WASHINGTON STATE, a public employee organization; WASHINGTON EDUCATION ASSOCIATION, a state of Washington nonprofit corporation; ARSEN DJATEJ, a married man; SUSAN MEGAARD, a married woman; DUANNING ZHOU, a married man; and ELIZABETH MURFF, a married woman; REX FULLER, a married man; NIEL ZIMMERMAN, a married man, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

FEARING, J. — Eastern Washington University (EWU) hired Michael Doron for a tenure-track position as an Assistant Professor of accounting. After his second annual review, EWU offered Doron reappointment with an improvement plan. Doron refused to participate in developing an improvement plan, after which EWU deemed Doron to have

refused reappointment and the school terminated his services.

Michael Doron sued EWU and various university administrators alleging breach of contract, violation of the covenant of good faith, violation of promises, wrongful discharge in violation of public policy, disability discrimination, and wrongful withholding of wages. The relevant contract is a collective bargaining agreement (CBA) between EWU and Doron's union. Doron sued some of EWU administrators also for defamation. Doron also sued his union, United Faculty of EWU (UFE), and the union's state-wide bodies, United Faculty of Washington State and Washington Education Association (WEA), for breach of the duty of fair representation and for tortious interference with business expectancy. The trial court granted summary judgment on all claims. We affirm.

## FACTS

Because the trial court dismissed all of Michael Doron's claims on summary judgment, we consider the facts in a light most favorable to him. Because of the many claims of Doron, the outline requires an extensive review of written agreements, documents, and correspondence.

Michael Doron graduated from Miami University in 1993 and then worked as an accountant in Columbus, Ohio. He became a licensed Certified Public Accountant (CPA) in 2000. That same year, Doron earned his masters in accountancy from Case Western Reserve University. From 2003 to 2005, Doron taught a variety of undergraduate and

graduate level accounting courses. In 2009, based on his dissertation titled, "The End of the Disinterested Profession: American Public Accountancy 1927-62," Doron earned his PhD in history from Texas A&M.

Michael Doron applied to EWU's College of Business and Public Administration (CBPA) to become a professor of accounting in a tenure-track position. Rex Fuller was then the dean of the business school, and Professor Arsen Djatej sat on the hiring committee. Djatej had met Doron at a conference and encouraged Doron to apply for a position with EWU.

Before offering Michael Doron employment, Dean Fuller and Professor Djatej discussed whether Michael Doron would be "academically qualified" for purposes of EWU's College of Business and Public Administration's accreditation with the Association to Advance Collegiate Schools of Business (AACSB). The association is regarded as the benchmark for gaging business school quality among the academic community. According to Jerry Trapnell, Special Advisor to the President of AACSB, the Association expects accredited business schools to employ "highly qualified" faculty as effective classroom teachers committed to continuous improvement. Clerk's Papers (CP) at 2591. A "qualified faculty member" is "one that demonstrates currency and relevancy in his/her academic discipline to ensure that the classroom environment is supported by the recent and relevant information from theory and practice." CP at 2591.

3

For accreditation purposes, schools must classify and justify each and every faculty member.

According to EWU Provost Rex Fuller, "academically qualified" requires publishing papers in the field of accounting. AACSB would consider Michael Doron, with a degree in history, to hold a degree in a field other than accounting. Therefore, for Doron to be "academically qualified" under AACSB standards, Doron "would have to consider ways to publish in more direct areas of accounting, such as auditing and other fields that he was assigned to teach." CP at 1423. Under AACSB standards: "The greater the disparity between the field of academic preparation and the area of teaching, the greater need for supplemental preparation in the form of professional development linked to the area of teaching." CP at 2593. The standards also read: "Regardless of their specialty, work experience, or graduate preparation, the standard requires that faculty members maintain their competence through efforts to learn about their specialty and how it is applied in practice." CP at 2593. A potential problem arose with EWU's hiring of Michael Doron since the Department of Accounting and Information Systems did not offer an accounting history class.

Dean Rex Fuller spoke to Michael Doron about the need to publish in a direct area of accounting. Doron asked if coauthorship with another would meet the requirement, and Fuller answered "yes." Arsen Djatej also spoke to Rex Fuller about coauthoring with Michael Doron.

4

To retain accreditation, 50 percent of a business school's instructors must be "academically qualified under AACSB standards." Fuller and Djatej agreed that Doron's PhD in history, and dissertation in accounting history, would qualify as a "related field" to accounting. So long as Doron's research and publications related to his field of teaching and demonstrated "currency and relevancy," Doron could be academically qualified. Accounting research is more empirical in nature than historical research. The history of accounting is more history than accounting.

Arsen Djatej promised to train and help Michael Doron meet EWU's research expectations. Djatej later testified:

> And part of the reason he approached me, because we had a somewhat similar background, academically I mean. And I told [Doron] that I did a transition myself to empirical study and I know the pattern, so I will help him to do the pattern; I will train him and mentor him to do the same thing. That was the discussion before [Doron was hired.]
> . . . .
> [T]he general idea when it comes to research was, when he comes, I will be the one who would share my experiences making transitions from what we call qualitative research to more quantitative, empirical type of research. And that was the general understanding.

CP at 1436-37. Doron similarly testified:

> [I]t was part of my understanding I was recruited to come to Eastern to work with Arsen [Djatej]. He would be co-authoring papers. If you want to say that was a promise of part of my employment, I guess it does qualify as that, yes.
> . . . .
> It was my expectation that when I came to Eastern, that's what would be happening. Arsen has some projects, one or two of them he

5

would bring me on, and I would be doing some work for him on those projects and I would be co-author.

Q: And who do you claim made that promise to you?

A: [Doron continuing] There was–well, Arsen obviously, is the one who had to make that promise.

CP at 1456.

On February 28, 2009, a member of the hiring committee, whose name is removed from the message, e-mailed Arsen Djatej, writing:

Dinner went well with Mike [Doron]. He's talking about where to locate in Spokane when he gets here. If we get an offer out soon, we should have an excellent chance to hire him. Your assurances of support for his research made a big difference in his attitude.

The dean [Rex Fuller] also made a good impression and discussed summer support with Mike. *The dean indicated that Mike's research in accounting history will be accepted at EWU* as long as it is in a [peer-reviewed journal].

CP at 1463 (emphasis added).

On March 5, 2009, business school Dean Rex Fuller offered Michael Doron a probationary, six-year tenure-track position with EWU as an Assistant Professor of Accounting and Information Systems (AIS), a department within the School of Business and Public Administration. A written offer set a base salary of $85,000 and allowed an $8,000 increase "upon the acceptance/publication of two peer reviewed journal articles (PJRs) in accounting," afforded summer research stipends, and granted reimbursement of up to $2,500 in moving expenses. CP at 228. The offer letter specifically noted:

This offer is contingent upon receipt of satisfactory transcripts from all institutions of higher education you have attended. All other conditions

6

of employment are set forth in the Collective Bargaining Agreement between Eastern Washington University and the United Faculty of Eastern, University rules, policies and procedures, and applicable state and federal laws.

CP at 228.

On March 17, 2009, EWU re-extended the same offer, but with a starting salary of $93,000. The March 17 letter stated: "If you believe you have been promised anything that is not included in this letter, do not sign and return the letter until you have called the Provost and Vice President for Academic Affairs." CP at 231. On March 30, 2009, Michael Doron accepted EWU's offer. Doron later testified that he accepted based upon Arsen Djatej's and Rex Fuller's promises that Djatej would be available to coauthor academic papers with Doron.

The CBA between EWU and the UFE governed Michael Doron's employment. Many sections of the agreement are critical to this appeal. Section 1.1 appointed UFE as the "exclusive bargaining representative regarding matters of wages, hours, and terms and conditions of employment . . . [for] employees of the University who are designated with faculty status." CP at 235. Section 3.3 of the CBA, "Authority for Appointment and Reappointment," provides: "Only those terms of employment that are made in writing to the appointees shall be binding upon the University." CP at 237-38.

Section 4.1.2 of the CBA imposed on Michael Doron, as a new professor, a probationary period of six years. Under the CBA, probationary faculty must be reviewed

7

and reappointed annually. Section 5.3.1, under "Retention of Probationary Faculty,"

states:

(a) Full-time faculty on probationary status will be evaluated annually, regardless of contract length, by the chair and by the personnel committee to determine reappointment. Probationary faculty will be provided with timelines relative to retention decisions. Such evaluations will be based upon progress in meeting goals outlined in the FAP. It is expected that the FAP will be in effect throughout the probationary period unless modified by mutual agreement between the faculty member, chair, personnel committee, dean, and Chief Academic Officer.

(b) As part of the evaluation process, the department/library will provide the faculty member with an annual assessment of progress on the FAP and a recommendation regarding probationary status. The evaluation will be signed by the faculty member and retained in her/his official personnel file in the Human Resources Office. If performance shortcomings are identified through the evaluation process, the probationary faculty member shall be provided with a plan to correct the performance shortcomings which includes timelines for improvement. The plan will be created by the chair and the affected probationary faculty member, and will be approved by the department/library personnel committee, the college personnel committee (if applicable), the dean and the Chief Academic Officer.

(c) The department/unit personnel committee and the chair shall each forward a recommendation to the unit dean as to whether the faculty member should be:
(i) Continued on probationary status.
(ii) Continued on probationary status with an improvement plan.
(iii) Removed from probationary status and continued as a special faculty member, except as defined in Section 5.4.4(d).
(iv) Given notice that their appointment will not be renewed or will be terminated according to the timelines described in Section 5.3.5 below.

CP at 242-43.

Section 5.3.4 of the collective bargaining agreement, titled "Probationary Contract

for Third Year Faculty," states:

> Following the third successful year of a probationary appointment, faculty will be provided with a three-year probationary contract. If performance shortcomings are identified through the annual evaluation process during the term of such contract, probationary faculty shall be provided with a plan to correct the performance shortcomings which includes timelines for improvement. The plan will be created by the department chair and the affected probationary faculty member, and will be approved by the department personnel committee, the college personnel committee (if applicable), the dean and the Chief Academic Officer. Probationary faculty who do not resolve performance shortcomings following an opportunity to do so may be terminated with notice as provided in Section 5.3.5 below.

CP at 244. And Section 5.3.5, "Notice of Nonrenewal or Termination of Probationary

Contract," provides:

> (b) Notice of intent not to renew an appointment for the following year, or to terminate a three-year probationary contract, shall be given in writing to the individual in accordance with the following standards:
> (i) Not later than March 1 of the first academic year of service if the appointment is to expire at the end of that year.
> (ii) Not later than December 1 of the second year of the probationary period if the appointment is to expire at the end of that year.
> (iii) For faculty in their third through sixth years of the probationary period, notice of intent not to renew shall be given no later than June 1 for a terminal appointment that expires at the end of the next academic year.

CP at 244.

Section 5.5 of the CBA, under the title "Reconsideration," provides: "In the event

of a negative recommendation by the Chief Academic Officer regarding retention, tenure

or promotion, the faculty member may file a request for reconsideration with the Chief

Academic Officer" within five days receiving the negative recommendation. CP at 247.

Section 5.6 describes how a faculty member is to accept or not accept reappointment, and

provides in relevant portion:

> 5.6.2 Letter of Appointment. Upon reappointment or continuation of appointment of a faculty member, an annual letter of appointment will be issued. The letter of appointment signed by the appointee shall be returned to the Chief Academic Officer within fifteen (15) days of its receipt to indicate the appointee's acceptance of the conditions of appointment.
>
> 5.6.3 Resignation. Faculty members who intend to resign their appointments should provide written notice to their unit dean at the earliest possible date. Faculty members who intend not to accept reappointment shall provide written notice thereof not later than fifteen (15) days after receipt of the letter of appointment.

CP at 250.

Michael Doron's Faculty Activity Plan (FAP) is at the center of this dispute. The

CBA requires each faculty member to develop a FAP. Section 7.3 of the CBA reads:

> 7.3.1 Plan Content
> The FAP shall be consistent with the University mission and Strategic Plan, college, library, and department strategic plans, [Policies and Procedures (P&P)], and the [CBA]. The FAP shall include all areas of professional activity, development, and expected performance; describe an equitable workload; and include any other expectations as required by department or college/library P&P. Where the FAP is intended to lead to tenure and/or promotion the plan shall so state.
> 7.3.2 Development of the FAP
> (a) Development of the FAP is a collaborative process. All continuing faculty members shall, in consultation with the department/library personnel committee and the department/library chair, prepare a FAP specifying areas of activity for the period of the plan. A new faculty member's FAP shall be prepared no later than the conclusion of the

first academic quarter covered by the plan.

. . . .

7.3.3 Approval of the FAP

(a) The FAP, including any agreed amendments or revisions made as a result of the collaborative development process described in Section 7.3.2, must be signed by the faculty member, and approved by the department/library personnel committee, chair, dean and the Chief Academic Officer. At the option of the college, and as expressed in the college P&P, FAPs may also require approval by the college personnel committee. A copy of all approved FAPs will be retained in the Human Resources Office.

(b) If a FAP is not approved by the department/library personnel committee, the chair, the college personnel committee (if required by the college P&P), the dean or the Chief Academic Officer, the faculty member will prepare a revised plan in consultation with the department/library personnel committee and the chair. If an acceptable plan is not prepared by the end of the subsequent quarter, the chair and department/library personnel committee will revise the plan in a manner that meets with the approval of the college personnel committee (if applicable), the dean and the Chief Academic Officer. Any dispute over the contents of the revised FAP will be resolved by the Chief Academic Officer. The revised FAP will govern the faculty member's approved activity for the period of the plan.

CP at 251-52. The initial term for an assistant professor's FAP is six years.

Section 7.3.5 allows modifications of a FAP. The section reads:

Modification of the Plan. FAPs may be modified during their term. A faculty or the chair may request in writing a modification. All modifications are subject to the same approval process as the original FAP.

CP at 252.

Article 13 of the collective bargaining agreement addresses discipline of a faculty

member. The article reads in part:

13.1 Just Cause. No faculty member shall be disciplined or discharged without just cause. Just cause guidelines commonly used by

11

arbitrators are set forth in Appendix A.

13.2 <u>Progressive Discipline</u>. The University shall apply where appropriate the principles of progressive discipline which include, but are not limited to, the following steps: verbal warning, written warning, suspension without pay and, finally, discharge. The University will not be required to apply progressive discipline where the nature of the offense calls for immediate discharge or imposing discipline without progression.

CP at 1843

Meanwhile, as Dean Rex Fuller, Professor Arsen Djatej, and Michael Doron negotiated EWU hiring Doron; Djatej sought and interviewed for a teaching position at Colorado State University. Djatej did not inform Doron that he might leave EWU for Colorado prior to Doron accepting the position at EWU.

On March 15, 2009, another member of the hiring committee e-mailed Arsen Djatej, writing:

1. Since Mike Doron agreed to come here mostly to work with you, you ought to let him know if/when you decide to accept the position at CO.
2. As Rex [Fuller] already knows about the offer [from Colorado], is it ok with you if I let Sue [Megaard] and Bill know you've got a $120K/yr offer with tenure? I'd like to see if we might be able to match the $ and tenure.

CP at 1465. Dean Rex Fuller thus knew before Michael Doron accepted employment with EWU that Professor Djatej might leave EWU for Colorado, but did not inform Doron of this possibility. Fuller testified: "I didn't think it was something I needed to talk to Michael about. Michael and Arsen had ongoing conversations, and my assumption was that that was made known through their conversations." CP at 1425.

12

Three weeks after Michael Doron accepted EWU's offer, Doron learned that Arsen Djatej was leaving for Colorado. In summer 2009, Michael Doron expressed concerns to Rex Fuller that Djatej no longer had an incentive to work with him. Fuller insisted that, given modern technology, Doron and Djatej would still be able to coauthor papers together.

On October 9, 2009, Michael Doron e-mailed Arsen Djatej, "This is the paper I presented in Cardiff. The section I want to expand into a separate paper is pp. 21-4." CP at 1468. Within an hour, Djatej responded: "Thanks Mike, I will read it over the weekend and get back to you some time next week." CP at 1468. Djatej did not.

In November 2009, in his first quarter of teaching, Michael Doron developed his Faculty Activity Plan. In relevant portion, Doron's FAP provides:

> **2. Quality of Teaching**
> **I must demonstrate acceptable levels of quality in teaching effectiveness, curriculum development, and student advising.**
> I am currently in the eighth week of my first quarter at EWU. I am teaming ACCT 450, Auditing I, and BADM 560, MBA Accounting. My goal this quarter, in addition to competently teaching the material, is to develop a familiarity with the skills and needs of the students in these courses. This will provide me with the perspective to develop these courses further in the future.
> The CBPA [College of Business and Public Administration] prioritizes excellence in the classroom. When I interviewed for this position, I was impressed with the dedication and coordination among the faculty to preparing both undergraduate accounting majors for careers in accounting and future managers in the MBA program to understand and evaluate accounting information they confront in their work. I intend to contribute to this commitment to our students. To assess my teaching effectiveness, my plan is to use the metric built into the IDEA instrument,

13

in particular Question 41 on the IDEA form, "Overall, I rate this instructor as an excellent teacher" which has a five point scale. My objective is to maintain an average of median ratings of 3.0 for my classes over the plan period.

I hope to teach all sections offered of ACCT 450, Auditing I, and BADM 560 and 505, the MBA Accounting courses. This will require a thorough understanding of the CBPA's and the AIS [Accounting and Information Systems] department's objectives for these courses and the skills and needs of our students. This quarter, I am relying both on my experience of the objectives of these courses and on the advice of my colleagues in the CBPA. In the Winter 2010 quarter, I will be teaching ACCT 450 again as well as BADM 505, and in Spring 2010 I will be teaching BADM 560. By the end of my first year, based on my experiences along with feedback from students and my colleagues, my goal is to prepare a comprehensive plan of how to meet the objectives of these courses and have a procedure in place to stay current on topics relevant to these courses.

. . . .

My workload has been set via the EWU Collective Bargaining Agreement, so that it may not exceed 36 credit hours. The College of Business and Public Administration Assigned Time Policy allows a reduction of teaching load for appropriate research activities that assist the College. Under this policy, I expect a teaching load no greater than 28 credit hours, provided I meet the eligibility requirements set forth in the College Policy.

I understand that I must be available to my students for career advising and for assistance with their coursework. The currently accepted norm is to be available to students and faculty in my offices for at least five hours per week. I will also be regularly available via email and voice mail.

**3. Quality of Research and Scholarship**

**I must demonstrate an acceptable level of research and scholarship centered on the business aspects of my areas of interest. Minimally, five journal articles must be published during the six years prior to my tenure consideration. These must be in blind-refereed journals or in journals of national stature, with the provision that up to two may be replaced by publications in refereed conference proceedings at a rate of two proceedings for one refereed article. . . .**

I currently have one publication in a blind-refereed journal, *Accounting History*, in August, 2009. In September, 2009, I published a

paper, adapted from my dissertation, in the refereed conference proceedings of the *Accounting, Business, and Financial History* conference in Cardiff, Wales.

Based on the suggestions I received at the ABFH conference, I plan to revise this paper and submit it to the *Accounting Historians Journal*, a blind-refereed journal, before the beginning of academic year 2010-11, with the expectation that it will be accepted during the 2010-11 year.

I am currently writing a third paper adapted from my dissertation. I hope to submit this in March, 2010, for presentation at the *Accounting History* conference in Wellington, New Zealand in August, 2010. This is also a refereed conference proceeding. My goal would be to submit this paper to a blind-refereed accounting history journal in 2011, with the expectation that it would be accepted during the academic year 2011-12.

If I am able to meet the above goals, I will have three sole-authored publications in blind-refereed journals and two presentations at conferences with referred proceedings at the end of my third academic year at EWU.

I have plans for a second project upon completion of the above work. I have identified the sources to be used. These include trade journals from the nineteenth century that span several decades and have never been utilized for accounting history research. I expect this work to yield multiple sole-authored publications in blind-refereed accounting history journals, which I can begin to submit before my probationary status at EWU ends in 2015.

CP at 314-15 (emphasis in original). By the end of 2009, all necessary university administrators approved Doron's FAP.

On December 6, 2009, Michael Doron e-mailed Arsen Djatej about another article idea, and possibly submitting it to the March 2010 conference in New Zealand.

After one quarter of teaching at EWU, the AIS Department Chair Elizabeth Murff and the AIS Department Personnel Committee both recommended retaining Michael Doron. On January 7, 2010, Murff wrote Dean Rex Fuller to recommend retaining Doron for the 2010-11 academic year. Murff noted that Doron had published one peer-

reviewed article, and she commented: "At this rate, he is on track at this time towards meeting the requirements set forth in his FAP for attaining promotion and tenure." CP at 380. Murff also noted that student evaluations were not yet available. On January 19, 2010, the AIS Department Personnel Committee wrote Fuller also recommending "Michael Doron's contract be renewed." CP at 382. The committee wrote: "We acknowledge that Professor Doron has successfully satisfied all requirements of a first-year assistant professor." CP at 382.

On February 3, 2010, Department Chair Elizabeth Murff summarized her peer evaluation of Michael Doron's teaching to Dean Rex Fuller. Murff wrote: "Dr. Doron is developing into an excellent instructor as he is rigorous in his expectations, current in terms of course content, well organized in presenting this content and rapidly developing beyond the presentation and engagement skills of a new assistant professor." CP at 385.

On February 4, 2010, Dean Rex Fuller wrote EWU's Provost and Vice President for Academic Affairs John Mason to recommend "renewal of Dr. Doron's contract for 2010-11." CP at 388. Fuller's memorandum addressed Doron's service to the community, teaching, and research. For service, Fuller noted that Doron served on the Graduate Affairs Council, which was sufficient for a first year faculty member. For teaching, Fuller wrote: "The student comments are mixed; however, like many new faculty [Doron] is adjusting his teaching approach to the level of students in the senior and MBA courses." And for research, Fuller wrote:

Dr. Doron completed his dissertation, published one peer review journal article, and presented one paper. These scholarly works are directly related to his discipline and are appropriate in meeting accreditation expectations for academically qualified faculty. In addition, he has several works in progress, suggesting an on-going research agenda. At this juncture he is meeting expectations in this area of responsibility.

CP at 388. In short, during Doron's first year of service, his research program produced a peer reviewed journal article and two international conference papers based on his dissertation research.

On February 15, 2010, Arsen Djatej responded to Michael Doron's October 9, 2009 e-mail:

Dear Mike, I finally read the article. I think there are some really good ideas in it. Now the question is where and how do you want to take it? We can rapidly convert it to an empirical research but I need some kind of data. Also, I am preparing for NZ conference in summer do you want to do something together? I have some ideas. Give me a call when you can.

CP at 1467.

On May 20, 2010, Michael Doron signed his "Faculty Workload for AY 2010-2011," which covered his second year at EWU. The document described his intended scholarship:

I will be presenting a paper at the 6th Accounting History International Conference in Wellington, NZ in August, 2010. This is a refereed, published conference proceeding. I have submitted a paper to the *Accounting Historians Journal* that I hope to have accepted in 2010. This summer I hope to complete another paper, "The AICPA and the Campaign for the Natural Business Year," that I will submit to the journal *Accounting History* in 2010 with the hope that it will be accepted in 2011. I have begun work on another paper, covering the original intent of the accounting

17

provisions of the Securities Acts of 1933 and 1934. I am currently reading the eleven-volume Legislative History of the Securities Acts, and am planning a trip to the Library of Congress in Washington, DC to study the papers of James Landis, the chief author of the Securities Acts.

Both Elizabeth Murff and Rex Fuller approved Doron's 2010-11 faculty workload. CP 392.

Arsen Djatej returned to EWU from Colorado in the summer of 2010 when EWU offered him tenure, new databases for research, and a bigger office. On July 1, 2010, Rex Fuller transitioned from Dean of the School of Business and Public Administration to Eastern Washington University's Interim Provost and Vice President for Academic Affairs. In this role, Fuller also served as Chief Academic Officer. Niel Zimmerman replaced Fuller as Dean of EWU's College of Business and Public Administration.

The AIS department personnel committee for Michael Doron's second annual review consisted of Arsen Djatej, Sue Megaard, and Duanning Zhou. The committee reviewed Doron based on his service to the community, teaching, and research. On October 18, 2010, the committee wrote Department Chair Elizabeth Murff to outline their concerns and recommendations. The committee's review of Doron was negative.

The personnel committee wrote that Doron attempted to modify one Masters of Business Administration (MBA) course, and eliminate another, unilaterally. "[Doron] was informed by a senior accounting faculty member, Dr. McGonigle, that he did not own the courses that he is attempting to modify or eliminate and that he needed to discuss

18

such plans and get the approval of the accounting faculty and AIS Department Chair before he went forward. According to Dr. McGonigle, Dr. Doron became indignant when he heard these comments." CP at 395. The committee "recommended that a different accounting faculty member be appointed to the MBA Committee." CP at 396.

The personnel committee further wrote, in its October 18 review:

> Overall, Dr. Doron's teaching effectiveness is weak at this point of his career. Although it is understandable for a first year faculty member trying to identify relevant teaching methods, there are some significant concerns from this committee:
> 1. In BADM 560 (MBA Accounting) class, Dr. Doron's students evaluation declined from 3.8 in the fall of 2009 to 2.8 in the spring of 2010, which is the bottom 10% comparing to peers.
> 2. Students complained that Dr. Doron only taught 2 hours in 4 hour classes.
> 3. Students complained that Dr. Doron didn't leave the classroom when students were conducting teaching evaluations.
> 4. Students complained that Dr. Doron didn't make prior arrangement to cover his classes when he left for a conference.
> 5. Students complained that Dr. Doron didn't give clear paper/case grading instructions.
> Considering the results of the students['] evaluation and the comparison results from IDEA, it is apparent that Dr. Doron is unable to effectively teach BADM560 and ACCT 251 courses. Due to the staffing specifics of the accounting program of CBPA, faculty are required to teach in different accounting subject areas. Unfortunately, at this point, Dr. Doron's capacity cannot be utilized outside of teaching Auditing I course, which is only offered two sections per year.

CP at 395.

The personnel committee also wrote:

> Dr. Doron has published two peer reviewed journal articles in accounting history in his first year at EWU. He has also presented his

19

> papers at conferences. The Academy of Accounting Historians has
> awarded Dr. Doron the 2010 Vangermeersch Manuscript Award for his
> paper "I Ask the Profession to Stand Still: The Evolution of American
> Public Accountancy, 1927-62." Dr. Doron is commended for his
> publication efforts in his first year at EWU.
>
> However, both the CBPA and AIS Policies and Procedures require
> faculty to publish in the subjects of their teaching responsibility. No
> accounting history courses exist at EWU for Dr. Doron to teach. Therefore,
> he will need to publish articles related to current auditing and accounting
> topics to be clearly within CBPA and AIS department policies.
>
> The College Policies and Procedures state that faculty with Dr.
> Doron's qualifications will be considered academically qualified (AQ) "if
> they maintain active involvement in the areas of teaching responsibility
> through writing . . ." These policies are intended to be fully compliant with
> AACSB-International standards for AQ status in order to assist in
> maintenance of EWU's business accreditation.
>
> The AIS Department Personnel Committee recommends that Dr.
> Doron engage in appropriate research and publication in current accounting
> and/or auditing to clearly support his AQ status under AACSB standards.
> In essence the committee is recommending a balanced approach between
> publications in accounting history and peer reviewed publications of
> accounting and auditing research related to his teaching areas.

CP at 394. The evaluation did not mandate that Michael Doron cease research and

writing on the history of accounting, but noted the lack of connection between the

research and writing, on the one hand, and his teaching assignments, on the other hand.

At the end of the October 18, 2010 evaluation, the personnel committee

commented on Michael Doron's collegiality:

> Dr. Doron has clearly rejected needed input from his colleagues.
> The AIS department chair and college dean arranged for Dr. Djatej to
> mentor Dr. Doron this year upon his return to EWU. However Dr. Doron
> demonstrated a lack of interest in being mentored. For example, when Dr.
> Djatej attempted to counsel Dr. Doron on appropriate and official ways of
> dealing with perceived issues in MBA-related accounting courses, Dr.

20

Doron appeared reluctant to accept the input on these matters. This again demonstrates that Dr. Doron is not a team player and that he lacks collegiality. It is recommended that Dr. Doron be mentored by a different suitable tenured faculty member, provided that faculty member agrees. Furthermore, Dr. Doron's unwillingness to cooperate has amplified his lack of collegiality to the point that written communications of this nature are unfortunately the best means of communication.

CP at 396. After giving "serious consideration to non-renewal" the AIS Department Personnel Committee recommended that Michael Doron "continues on probationary status but with an improvement plan." CP at 396.

In an October 25, 2010, letter to Business School Dean Niel Zimmerman, Elizabeth Murff echoed the AIS Department Personnel Committee's concerns and recommendations concerning Michael Doron. Murff recommended that Doron:

> 1. Continue on probationary status with an improvement plan (see part 4) in accordance with section 5.3.1(c)(ii) of the Collective Bargaining Agreement.
> 2. Keep the same teaching load next year as he had this year (24 credits), although different courses may be assigned to reduce the time stress by reducing the number of preps.
> 3. Have his workload rebalanced immediately by reallocating time into research by reducing his service component to serving as faculty advisor to Beta Alpha Psi only.
> 4. Must develop an improvement plan in accordance with section 5.3.1(b) of the Collective Bargaining Agreement by the first week of Winter Quarter 2011. As my discipline is not accounting, I am requesting that Dr. Doron develop this plan with input from a senior accounting faculty mentor familiar with teaching and research in the accounting discipline. It is Dr. Doron's responsibility to identify this mentor. This plan needs to specifically address the deficiencies noted above in teaching effectiveness and research in current accounting/auditing practices. The plan must include specific benchmarks for evaluating progress, including appropriate deadlines, and needs to be approved by the department chair,

21

the department personnel committee, the dean, and the chief academic officer at EWU. Progress with respect to this improvement plan will be evaluated during the 3rd to 3-year reappointment process in the spring of 2012 so that an appropriate decision with respect to retention can be made at that time.

CP at 403-04 (emphasis in original).

Both the AIS Department Personnel Committee and Department Chair Elizabeth Murff stated that each would respectively recommend nonrenewal the following year if Michael Doron did not successfully complete an improvement plan.

On October 29, 2010, Elizabeth Murff and Sue Megaard, as member of the AIS Department Personnel Committee, met with Michael Doron to present their concerns and recommendations. At the meeting, Murff told Doron "there are problems with your teaching and research," "we don't teach accounting history here," and you "may be a bad fit" at EWU. CP at 472. Doron replied that, if EWU did not want him researching accounting history, "someone made a mistake in hiring me." CP at 173, 472. Michael Doron feared he might "be immediately fired." CP at 718. Doron also feared that an improvement plan would change the direction of his academic research.

After his meeting with Elizabeth Murff and Sue Megaard, Michael Doron phoned Provost Rex Fuller. Fuller recommended Doron contact Gary Krug, president of Doron's union, the United Faculty of EWU, to discuss his concerns regarding his second year evaluation.

On October 30, 2010, Michael Doron e-mailed Gary Krug:

22

Rex Fuller recommended I get in touch with you. My relationship with my colleagues and dept. chair in the Accounting and Information Systems Dept. has become strained over issues relating to my FAP and reappointment. I need to know my rights and responsibilities in the process. If it would be possible for you to meet with me this weekend, that would be very helpful as the dept. is asking me to begin developing an improvement plan on Monday. Thanks very much.

CP at 1052. Doron and Krug met twice to discuss Doron's concerns. Doron provided a copy of his FAP to Krug. Doron expressed his concern that any improvement plan would be inconsistent with his approved FAP.

On November 5, 2010, the AIS Department Personnel Committee wrote Elizabeth Murff to recommend that Michael Doron no longer teach two upper level accounting courses. The committee wrote: "Before he can return to BADM 505 or 560, he needs to complete this remediation in ACCT 252 and possibly teach ACCT 356 and 357 as well." CP at 2364.

On November 9, 2010, Gary Krug and UFE Chief Steward Chris Kirby met with Elizabeth Murff, Niel Zimmerman, and Arsen Djatej "to discuss the issues raised by Dr. Doron, to try to understand the position of the department and the dean, and to begin trying to talk through a resolution to the problem." CP at 1027. Krug did not invite Michael Doron to attend this meeting. Those attending agreed that any modification to Doron's FAP would require Doron's approval.

On November 10, 2010, Dean Niel Zimmerman wrote Provost Rex Fuller: "With the understanding that an Improvement Plan will be in place no later than the end of the

23

first week of Winter Quarter 2011, I support the retention of Dr. Michael Doron for his 3rd year at EWU." CP at 406. Zimmerman sent copies of this letter to Elizabeth Murff and Michael Doron.

Michael Doron met with Elizabeth Murff and Arsen Djatej twice in November 2010. Doron testified about those meetings:

> I said that what I wanted done was that my second-year evaluations be redone and state that I am meeting all of the standards in my FAP. And I said once that's taken care of, then we will start talking about how to improve my teaching and my research. I said if you want me doing research in areas outside of accounting history for AACSB standards, that makes perfect sense. When I was hired, it was understood that I would be working with Arsen, and we can do that again. I will work with Arsen. You want me teaching other courses, I will teach other courses.
>
> . . . .
>
> Coauthoring a paper with Arsen, it was impossible until Arsen got in touch with me and said, "Here's the project we're coauthoring." As I said, it's Arsen's project; it's dependent on Arsen. I had said very clearly, "I'm open to that. I've always been open to that. I was hired to do that. Let's go for it." But Arsen is the one who would have to go ahead and make that happen."

CP at 722, 740.

Michael Doron further testified:

> Q Was there anything you asked him [Arsen Djatej] to do specifically that he didn't do?
> A No.

CP at 1457.

In a critical passage in his deposition, Michael Doron declared:

> Q At any point in time did he refuse to co-author papers with you?

24

A   As I said, there was no explicit rejection of that. That didn't happen, no.

Q   So was there ever an explicit promise made by Arsen that he didn't fulfill?

Mr. Kirby: Objection: asked and answered.

A   I would like to give a longer answer to that. That's not something that I can say yes or no.

Q   By (Ms. Clemmons): Okay.

A   I was hired explicitly with the understanding that I would be co-authoring with Arsen, and he left. Then I was left to start at Eastern without being able to rely on him because he was no longer employed at Eastern.

So I have got my research going on which is this accounting history, what I do. So I wrote up my FAP talking about what I can do, what I plan to do with accounting history, and it gets approved. And everything is fine for a year.

Then the second year evaluations, they say that what I have been doing for the last year, what they explicitly signed off on isn't working. And so I offer right away in those first meetings that Beth [Chair Murff] and Arsen were at, you want me co-authoring papers with Arsen like I originally was hired to do, that's no problem. I will do that. And the idea never goes anywhere.

Q Arsen had returned. Was there anything that would prevent you from co-authoring papers with Arsen after he returned to Eastern Washington University?

A As I said, I was working on my stuff. Everyone had signed off on it. I thought what I was doing on my own was fine. I didn't need more projects working with Arsen. I wasn't refusing. There was no need for it.

As soon as they told me there is a need for it, I offered: That's fine. You want me brought in on Arsen's projects? No problem. Just tell me what to do.

Q   I understand what you are saying that you started your own projects so you didn't see a need to co-author anything and you were not eliciting co-authoring. Correct?

A Except as we've already gone through. I did try to get him to co-author that one paper of mine.

Q   And I simply want to know if you're contending Arsen didn't do something that he explicitly promised he would do?

MR. KIRBY: Objection, asked and answered.

A Yeah. I have explained exactly what did happen. Was there a moment when I said please bring me in on one of your projects, and he said no? That didn't happen. But I've explained what did happen, and I feel that that is him not sticking with the terms I was hired under.

Q (By Ms. Clemmons) What did Arsen do wrong to change the terms?

A The understanding was that I would be co-authoring with him. Once they brought it to my attention that what I was doing was no longer good, I said fine. Let's go back to what we originally agreed to when I was hired. I'll co-author with him.

At that point he had a responsibility to fulfill the promise he made to me. Had he said, Here is the project I am working on, this is exactly what I want you to do, and you do this, and it will be co-authored and everything will be fine, and he didn't do that. And I explicitly offered I will do that if that's what you want. He never followed up.

Q Did you ever go to him to say let's co-author something and this is what we should do other than the e-mails you referred to?

MR. KIRBY: Objection to the form of the question. It's been asked and answered several times.

Q (By Ms. Clemmons) Dr. Doron, what I just simply want to understand is – there is a general understanding you are going to work together and co-author something, but you haven't identified specifically what. Correct.

A It never was identified specifically what, yes.

Q In the discussions did you identify this is how I am going to approach you and it is my responsibility to tell you what to do and how the co-authoring would occur?

A We never got into those kinds of details.

Well, to some extent these were his projects. I told him I do not have a strong background in econometrics and computer programming. He said, That's fine. What you can do is maybe collect data for me, maybe write the literature review for the paper. And I figured, yeah, okay, I can do that.

Q So you have this general understanding that you are going to work with someone. He is amendable [amenable] to working with you, correct?

A What do you mean he is amendable [amenable] to working with me? I don't know that that's correct, no.

26

Q At the time that you reached this understanding with him, he was amendable to working with you?

A Well, that's what he promised to do. So I would have to assume he was amendable, yes.

Q And you promised to work with him, too, correct?

A It was the understanding when I was hired that I would be doing that with him, yes.

Q Other than the general understanding that the two of you would work together, was there any specific terms as to how that would occur that anyone violated?

A We never set explicit terms like that.

CP at 1458-59.

On November 18, 2010, UFE President Gary Krug and Michael Doron met with Elizabeth Murff and Arsen Djatej. Doron asserted that his approved FAP remained viable, and should be enforced as part of any improvement plan. Krug commented that he represented every person there. According to Krug, he searched for "a satisfactory agreement that would protect Dr. Doron, that would ensure the department accreditation standards and the CBA was not violated." CP at 1011. To this end, Krug proposed that Doron rewrite his FAP. Doron declined since he wanted his existing FAP "enforced as written." CP at 1018.

In a November 19, 2010 e-mail message to Gary Krug, Michael Doron expressed his disappointment with the November 18 meeting and with the assistance from Krug:

As I told you last night, I am very disappointed in how the meeting went, particularly in your performance. I will try to schedule another meeting with Beth and Arsen to repair the damage that was done. I do not want you in attendence [sic] at this meeting. Because they obviously do not understand that their evaluations need to be based on my progress in

27

meeting my FAP, it appears they do not intend to rewrite their evaluations. If I am able to change their minds, we can move forward from there. If not, I need to know that you are willing to help me file a formal grievance stating that the evaluations are in violation of the CBA. I need you to give me a firm answer on this before I meet again with them, so I am not left in a position of waiving my rights.

I also need to address your statement at the meeting last night that you are there to represent "everyone's interests." That was not my understanding when I came to you and is not what you told me in our many conversations. My understanding is that your role as union rep. is to ensure that my rights are protected under the collective bargaining agreement. Is this correct or not? I would like a firm answer so that I can assess whether I can trust you going forward. I will be anxiously waiting for your response, as I have to continue working on this.

CP at 1058.

Gary Krug responded to Michael Doron on November 21:

I strongly advise against your taking unilateral action in your case. You are always free to conduct your own case if you so desire, but UFE cannot represent you once you begin to do so. Be further advised that the filing of grievances is solely the decision of UFE based on our assessment of a case.

You have some misconceptions about how these matters are conducted. UFE represents and enforces the contract. All members and entities in the bargaining unit receive equal protection and advice regarding the enforcing of the contract. I am not your attorney. I work for the CBA.

Your case is complex and is based upon the FAP you presented to me as well as other matters raised by the Dean and the chair of the DPC [Department Personnel Committee]. I will tell you frankly that after consultation with others in the UFE Executive Board I have deep concerns regarding your FAP as a document. It seems to fail meeting specific CBA criteria for an FAP given in 7.3.1, and parts of it are vague in the extreme making assessment difficult if not impossible. We are currently taking advice regarding the best way to proceed. I am available discuss this with you on Tuesday 1:00 PM in my office when I may have further knowledge.

CP at 1058. Gary Krug copied UFE's President of Bargaining Suzanne Milton and WEA

Organizer Gary McNeil on his response to Doron.

On November 22, in the same e-mail thread, Doron wrote Krug:

> I still do not understand what you are telling me. I came to you to have an advocate in dealing with a violation of the CBA by my supervisors. I asked you when we first met if I needed a lawyer and you said no, the union would provide me with one if I needed it, but I wouldn't need it because my case was "an easy one." You will also recall that prior to the meeting with my chair and DPC you waited in my office with me and then we walked into the meeting together. This is what an advocate would do. The last paragraph of your email is particularly troubling. We have discussed many times that my FAP is crystal clear on the standards I am to be evaluated on. I would also remind you that it is an approved FAP, all the way up through the Provost of Eastern Washington University. It would certainly not be my fault or my responsibility if the document I signed in good faith and have been following for a full year did not meet CBA standards.
>
> Finally, who are these people you are all of a sudden cc'ing in your email to me?

CP at 1061. Krug replied:

> As I said, working a problem is a process. On first glance, the 3.0 median score looked ok, but it is stated as an "objective." Further, as I noted this FAP falls short on points of 7.3.1 and possibly other areas. The mission of the UFE, again, is to clarify and enforce the contract, the FAP, being a document under that contract. As such, if the FAP does not meet the CBA it is not a valid document. It does not matter who signed this document. This is the first time UFE has seen it and has had opportunity to study it in detail. UFE will recommend that the existing FAP be rejected and that a new one that meets the requirements of the CBA be drafted by the end of Winter quarter.
>
> Regarding your question of persons cc'd. Suzanne is VP for Bargaining, Gary McNeil is our state organizer. All communications copied to them are confidential.

CP at 1061.

WEA representative Gary McNeil first heard of the dispute between Michael Doron and EWU when Gary Krug forwarded him a copy of the November 21 e-mail message. As an organizer for WEA, McNeil helped to negotiate the EWU CBA. Krug later testified: "Gary McNeil is someone I will consult with from time to time regarding cases from time to time. He sometimes has some very good ideas." CP 1012. Krug kept McNeil apprised of the dispute between Doron and EWU, stating "I valued his advice and I found him—I found him to be a good person to sound ideas from, particularly the idea of the—of understanding the role of the FAP in all this." CP at 1014.

On November 22, 2010, Gary Krug asked for Gary McNeil's feedback on a proposed e-mail to EWU officials, which outlined the purported deficiencies in Michael Doron's FAP. When later deposed, Krug could not remember whether McNeil answered his request for feedback. There is no evidence in the record that he answered. Less than one hour after requesting McNeil's feedback, Krug sent the e-mail to Michael Doron, Department Chair Elizabeth Murff, and Arsen Djatej, with a copy to Provost Rex Fuller, Business School Dean Niel Zimmerman, and McNeil. Krug wrote:

> It is the opinion of UFE that the Faculty Activity Plan for Michael Doron, dated November 20, 2009 is flawed, indefensibly vague, and not in compliance with the requirements for an FAP stated in the Collective Bargaining Agreement in effect 2009-2013. In particular the document is not in compliance with Article 7.3.1 and subheadings of that article.
> "7.3.1 Plan Content. The FAP shall be consistent with the University mission and Strategic Plan, college, library, and department strategic plans, P&P, and the Agreement. The FAP shall include all areas of professional activity, development, and expected performance; describe an equitable

30

workload; and include any other expectations as required by department or college/library P&P. Where the FAP is intended to lead to tenure and/or promotion the plan shall so state."

Doron's FAP does not state that it is intended to lead to tenure and promotion.

Doron's FAP is not consistent with the college P&P.

Doron's FAP presents assessment criteria that cannot be measured and it does not include metrics from the college P&P.

We do not hold this list to be exhaustive or complete.

UFE proposes that either the Chair of ACIS or Dr. Doron requests a new FAP to be negotiated as is set forth in the CBA 7.3.5. This process should be completed by the end of Winter Quarter.

CP at 1065. Section 7.3.5 is the previously quoted section that allows for modification of a FAP at the request of either the faculty member or his or her department chair.

On November 24, 2010, Department Chair Elizabeth Murff e-mailed Michael Doron notifying him of his new teaching load, consisting of lower level classes and the need to develop an improvement plan by January 7, 2011. Murff attached a revised faculty workload to this e-mail, which described Doron's scholarship goals as submitting for publication and presenting at a conference "at least one article clearly related to current accounting/auditing practice." CP at 787. Murff's e-mail also stated:

In accordance with article 7.3.5 of the CBA dated 10/8/09-8/31/13 and Gary Krug's email of 11/22/10, as department chair I am requesting a modification of your current FAP in order to bring it into agreement with the various documents mentioned in article 7.3.1 of the CBA and with standard 10 of our AACSB Accreditation. This process needs to be completed by the end of Winter quarter, March 18, 2011.

CP at 784.

31

On December 1, 2010, EWU Provost Rex Fuller, as Chief Academic Officer,

approved the reappointment of Michael Doron, writing:

> I am pleased to inform you that I concur with the recommendations of your departmental colleagues, your department chair, and your dean and approve you for appointment, with an improvement plan, to an additional year in your probationary period through the 2011-2012 academic year. You will be reviewed for tenure and promotion during your final year of your probationary appointment.
>
> As noted by the DPC, department chair, and dean, you are required to develop an improvement plan by no later than the end of the first week of Winter Quarter 2011, pursuant to section 5.3.1.b of the *Collective Bargaining Agreement*. You should focus this plan on ways to improve your teaching effectiveness and demonstration of scholarly activities related to the expectations outlined in the department and college policies and procedures and your FAP. As you know, the CBA enables you to revise your Faculty Activity Plan for consistency with these expectations. In order for you to be eligible for tenure and promotion, you will need to demonstrate effective teaching and produce appropriate peer-reviewed scholarly works as outlined in your department and college policies and procedures.

CP at 793. Under section 5.5 of the CBA, Michael Doron had five days from the date of

this letter to petition Provost Fuller for reconsideration of the "negative

recommendation." Also, under section 5.6.2 of the CBA, Doron had fifteen days to

accept "the conditions of appointment," or, under section 5.6.3 of the agreement, fifteen

days to provide notice of his intent to "resign." CP at 250.

On December 1, 2010, Michael Doron replied to Elizabeth Murff's November 24,

2010 e-mail and asked that his teaching load not change. Murff denied Doron's request

later that afternoon.

Section 7.5.6 of the CBA governs "Disputes Over Workload" and initially requires UFE to contact the department chair to arrange a meeting. "If the meeting does not result in a mutually agreed resolution, and the UFE chooses to pursue the dispute," the union president refers the dispute to the Faculty Review Committee (FRC). CP at 257.

On December 6, 2010, Michael Doron e-mailed Gary Krug to expressly request that UFE file a grievance against EWU for revising Doron's faculty workload without his consent. Krug refused to file a grievance, because he believed Doron would be best served by renegotiating his FAP. Doron further requested Krug refer the dispute to the Faculty Review Committee under Section 7.5.6 of the CBA. Krug also refused this request, later testifying: "Any Faculty Review Committee would have simply come back to the FAP, the CBA, and the P & Ps on this. With, in my opinion, a fatally flawed FAP, it would be a waste of time and wouldn't lead to a satisfactory resolution." CP at 1025.

On December 10, 2010, union president Gary Krug met with Dean Niel Zimmerman and Provost Rex Fuller. At that meeting, all agreed that Doron's FAP could not be changed without Doron's consent. Krug did not inform Michael Doron of this consensus. Krug warned Zimmerman and Fuller that if EWU pushed an improvement plan on any issue other than teaching, United Faculty would file a grievance. On December 15, 2010, UFE President Gary Krug e-mailed Michael Doron to encourage him to renegotiate his FAP in good faith with his colleagues.

On December 21, 2010, Michael Doron e-mailed Department Chair Elizabeth

33

Murff, outlining his continuing concerns. Doron began: "I have determined that rewriting my approved Faculty Workload, signed by you, Rex and myself last spring, would be a violation of the Collective Bargaining Agreement that I would not be comfortable colluding in." CP at 795. Doron noted that his workload had changed without his input, that he did not receive sufficient notice in violation of the CBA, and that the revised workload set goals in a scholarship exceeding the scope of his FAP. Doron concluded: "If I am forced to teach ACCT 252, it will be with the understanding that I believe this to be a violation of the Collective Bargaining Agreement and that I am not waiving any rights to pursue legal remedies in the future." CP at 795. Doron forwarded this e-mail to Gary Krug.

On January 1, 2011, Niel Zimmerman e-mailed Michael Doron to confirm that Doron would teach Accounting 252. Zimmerman noted that Doron was "free to continue to dispute this assignment," but failure to "show up . . . may be the basis for discipline." CP at 820. Doron confirmed that night that he would teach the class.

On January 3, 2011, Elizabeth Murff e-mailed Michael Doron to remind him that he needed to develop an improvement plan by January 7. Doron responded on January 5:

> The Collective Bargaining Agreement states that "Full-time faculty on probationary status will be evaluated annually" and that these "evaluations will be based upon progress in meeting goals contained in the FAP" (Article 5.3.1a). In discussing Improvement Plans, the CBA goes on to explain that "if performance shortcomings are identified through the evaluation process, the probationary faculty member shall be provided with a plan to correct the performance shortcomings" (Article 5.3.1b). As I have

34

pointed out several times, I am meeting, in fact exceeding, all of the standards in my approved FAP. It would therefore be a violation of both the spirit and the letter of the Collective Bargaining Agreement for an Improvement Plan to be prepared in my case. I will not participate in this process and will not agree to any changes to my FAP. I am enclosing a discussion of the issues identified in our conversations and emails.

CP at 822. In the attached document, Doron summarized that he was hired to conduct research in accounting history, his FAP embodies that expectation, and EWU encouraged him when he successfully presented a paper on accounting history in New Zealand.

In a deposition, EWU questioned Michael Doron:

Q: Request for Admission No. 16 states: "Please admit that you refused to accept Eastern Washington University's conditional offer of reemployment for the 2011/2012 school year."
Your response after an objection states: "Admit that Doron believed that EWU violated the CBA by conditioning renewal of Dr. Doron's probationary appointment upon Dr. Doron developing an Improvement Plan which required Dr. Doron to revise his approved FAP without Dr. Doron's consent.
"Further admit that Dr. Doron did not develop an Improvement Plan after EWU refused to provide assurances that Dr. Doron would not be required to revise his approved FAP."
"Otherwise deny."
That really doesn't respond to the question.
Did you refuse to accept a conditional offer from EWU of reemployment that would have included an Improvement Plan for the 2011/2012 school year?
A: I did finally -- that e-mail --well, this one that you have already shown me, I said I will not participate in writing an Improvement Plan. They then went ahead and didn't reappoint me on that basis.
Q: Didn't they, in fact, draft an Improvement Plan for you and make an offer that any reemployment would be conditioned upon the Improvement Plan?
A: Beth [Chair Elizabeth Murff] did write up -- well, I don't know if it was an Improvement Plan. It was a new workload.

35

Well, yeah, I don't know that that was an Improvement Plan. She sent me a workload that she had written up. I don't know that they ever sent me an Improvement Plan.

Q: Did you get a conditional offer of reemployment for the 2011/2012 school year from Eastern Washington University?

A: Yeah. I believe a letter from Rex said with the understanding that you develop an Improvement Plan. Yes, I think that's right.

Q: Do you consider that a conditional offer of reemployment?

[Doron's Counsel]: Objection to the form of the question. It requires a legal conclusion.

Try to answer it.

A: Yes, that's how I understood it.

Q: (By Ms. Clemmons) Did you reject the conditional offer of reemployment for the 2011/2012 school year?

[Doron's Counsel]: Objection to the form of the question. It requires a legal conclusion.

A: Again, in this e-mail here I say I refuse to do an Improvement Plan. And I say -- well, I didn't say -- but I guess my implication was you guys go ahead and do what you're going to do based on that. You want to not reappoint me because of that, then do that.

Q: I am looking for you to simply say I either accepted the offer or I rejected the offer.

And you were made a conditional offer of reemployment for the 2011/2012 school year. Did you accept it or reject it?

[Doron's Counsel]: Objection to the form of the question. It requires a legal conclusion; asked and answered.

One more time.

A: I never explicitly wrote a letter "I reject this." So I guess my answer is, no, I didn't accept or reject.

Q: (By Ms. Clemmons) In the letters you did write, did you consider yourself to be rejecting it?

A: That's what I was implying, yes.

Q: At any point in time did you write anything indicating that you were accepting that conditional offer?

A: Again, I would point to the suggestions I tried to make about what -- how we could justify my work, how we could change things, what I wanted to see us do. So I don't know. I would take that as my trying to negotiate on that point.

But, no, I never accepted the conditional offer of employment.

CP at 1660-63 (emphasis omitted).

Michael Doron testified regarding his January 5, 2011 e-mail:

Q. Did you meet the time lines provided by Eastern Washington University to develop an improvement plan?
A. That's a long answer. I made many efforts to negotiate with them over time. As we've said, finally -- when they made it clear to me, when Niel Zimmerman made it clear to me that the whole process was meaningless, I finally said, "I will not participate in this anymore."
Q. And that was January 5th, 2011, correct?
A. I believe the memo we looked at Wednesday, yes, I think January 5th.
Q. And did you understand at that time that it was clearly the university's position that if you did not participate in developing an improvement plan, that you would not be renewed for the following year?
A. They did clearly state that was their position.

CP at 1677-78 (emphasis omitted).

On January 9, 2011, Michael Doron e-mailed Gary Krug:

You may recall the email below, dated nearly a month ago, where you ask for my "continued indulgence" and plead that "many people are working hard on this case to bring about a resolution." Since I have heard nothing from you since, I am assuming this email, like everything else you've done in my case, was some sort of joke. In the meantime, I continue to fight single-handed against the entire administration of the College as they tear my "contract" to shreds. Anytime the UFE would like to get involved, let me know.

CP at 1085.

Gary Krug responded on January 12:

Several members of UFE executive have met and reviewed your

case on multiple occasions. We have also consulted with EWU administration regarding your case, and we have considered all communication from you.

UFE has been clear that the central document in your contract, your FAP, is deeply flawed. UFE has found nothing to grieve in your case with the exception of the FAP itself, and as neither you nor administration have expressed any interest in this solution, there is no action for UFE to take.

We have encouraged you to develop a compliant FAP that would clearly define the conditions of your employment. You have declined to take this advice and have followed your own counsel. UFE cannot advise you on actions that you take contrary to our recommendations.

Throughout, UFE has acted in what we believe is your best interest and the best interest of the CBA.

CP at 1085.

On January 20, 2011, Business College Dean Niel Zimmerman e-mailed Michael

Doron to extend the deadline for developing an improvement plan and outline the

consequences for not doing so. Zimmerman wrote:

Your email of 1/5/11 regarding the requested improvement plan and revised FAP indicated that you "will not participate in this process and will not agree to any changes to [your] FAP." That email has been read and given due consideration. However, the situation remains as follows:

As significant issues were noted during the evaluation process in the areas of teaching and research, your annual evaluation resulted in recommendations for continuation on probationary status with an improvement plan [CBA 5.3.1(c)(ii)] by the dean (dated 11/10/10), the department chair (dated 10/25/10), and the department personnel committee (dated 10/18/10). Though the previously set deadline (1/7/11) for completion of a meaningful improvement plan that leads to tenure [CBA 5.3.1(b)] has now passed we would like to extend one last opportunity to develop an improvement plan that addresses the issues noted and provides direction for you concerning your progress toward tenure and promotion. As your department chair is not of your discipline and the issues noted are primarily discipline based, Dr. Arsen Djatej is available to assist you in developing the plan. Your department chair, Dr. Elizabeth Murff, will act

in oversight and approval roles. This process must begin by February 1, 2011 with a completion date of February 18, 2011. **Failure to develop an improvement plan may lead to progressive discipline [CBA 13.2].**

At the recommendation of the UFE (dated 11/22/10), the department chair requested a modification of your current FAP in order to bring it into agreement with the CBPA Policies and Procedures, CBA 3.6.1 and 7.3.1 and AACSB Standard 10. This request was made to you in accord with CBA 7.3.5 on 11/24/10. The DPC [Department Personnel Committee] would like to meet with you before February 28, 2011 to get this collaborative process going. Please confirm to me your willingness to proceed, and we will arrange a meeting with the DPC. The deadline for completion of this process [CBA 7.3.2 and CBA 7.3.3] was given as March 18, 2011. **If a revised FAP in accord with CBA 3.6.1, and 7.3.1 and AACSB Standard 10 is not prepared by this date, then your existing FAP will be revised by the department chair and the department personnel committee such that it meets the approval of the dean and the Chief Academic Officer [CBA 7.3.3(b)].**

Please let me know, in writing, by January 28, 2011 whether or not you agree to participate in the development of the improvement plan and the revised FAP.

CP at 413-14 (emphasis in original).

Michael Doron responded to Niel Zimmerman's January 20, 2011, e-mail on

January 25:

Thank you for your email. I would need to be assured that these meetings are good faith negotiations and not simply steps towards disciplinary action. Particularly, the points I have raised in my previous communications must be addressed:

1.) Beth [Murff] already prepared a new Faculty Workload for me. I discussed the problems with this document in my email of Dec. 21st and have received no response.

2.) Your email does not even acknowledge the six-page memo I sent on January 5th. This suggests that my concerns are not being taken seriously.

3.) I am still unclear on what the terms of this renegotiation will be. Once my FAP and Workload have been rewritten, what assurance will I

have that these documents will remain in force for the remainder of my probationary period? Does the administration reserve the right to unilaterally change the terms of my employment whenever it sees fit?

CP at 416 (emphasis omitted).

Dean Niel Zimmerman responded on January 27 by both e-mail and letter. In his e-mail response, Zimmerman explained that Elizabeth Murff responded to Michael Doron's December 21, 2010 e-mail on December 23, and that Murff's e-mail noted the "draft" nature of Doron's revised workload. Zimmerman reiterated the position that Doron needed to produce some intellectual contributions related directly to current accounting practice in order to demonstrate qualification to teach in those areas and Doron's intellectual contributions in accounting history did not accomplish that.

In his January 27 letter, Niel Zimmerman reminded Doron that his "reappointment for the 2011-12 academic year was offered based on the requirement that [he] develop an improvement plan." CP at 848. Zimmerman continued:

> Despite your failure to work with the Department chair to create an improvement by the January 7, 2011 due date, the University offered you a later date.
>
> . . . .
>
> The CBA language requires that you develop an Improvement Plan, in conjunction with the chair, CBA 5.3.1(b). Your letter of reappointment requires that you develop that plan as a condition of your reappointment. Therefore, I am directing you to participate in that process, consistent with the provisions of the CBA, which include meeting with Dr. Murff by February 1, 2011, and completing an Improvement Plan no later than February 18, 2011. **As previously communicated, if you fail to develop an Improvement Plan, this may lead to discipline. Furthermore, if your [sic] fail to begin participation in the development of an**

40

> **Improvement plan by February 1, 2011 and/or fail to complete an Improvement Plan by February 18, 2011, this may be treated as insubordination and may also lead to discipline as provided by Article 13 of the CBA.**
>
> In closing, the University is interested in working with you to complete an Improvement Plan as provided by the terms of the CBA. Therefore, I truly hope that you will consult with Dr. Arsen Djatej and work with Dr. Murff to develop a plan.

CP at 848-49 (emphasis in original).

On February 2, 2011, Michael Doron responded to Niel Zimmerman's January 27

letter, again refusing to participate:

> Thank you for your email. I asked for "assurance that the meetings would be good faith negotiations and not simply a step towards disciplinary action." You have answered my question plainly. Your email ignores most of my concerns and offers risible rejoinders to the rest. What is consistent is the complete absence of any attempt at conciliation, any concession that anyone but myself bares any responsibility for this situation. You have made it clear that these "meetings" would simply be a pretense to begin disciplinary action. Let me save you the time: I will not participate in this process, and will not agree to any changes to my approved FAP or Faculty Workload.

CP at 425.

On February 7, 2011, Provost Rex Fuller wrote Michael Doron:

> The purpose of this letter is to inform you of my conclusion that you have rejected the conditions of your reappointment for the 2011-2012 academic year. My conclusion is based upon your repeated refusal to participate in the development of a performance improvement plan, which is a required term of your reappointment.
>
> . . . .
>
> By these responses, [referring the January 5 and February 2 refusals,] you have rejected your reappointment for the 2011-2012

41

academic year. Accordingly, your employment at the University will terminate at the end of your current term of appointment, June 15, 2011.

CP at 427-28. Fuller did not support this conclusion with "just cause" or follow the discipline procedures in Section 13 of the CBA.

On February 9, 2011, Michael Doron forwarded Rex Fuller's February 7 message to UFE President Gary Krug, writing: "The university has terminated me effective June for not writing a new FAP. This is something the union will have to act on. Let me know." CP at 1087.

Gary Krug forwarded Michael Doron's e-mail to WEA's Gary McNeil, writing: "Have the procedural, contractual steps been followed here? Is just causes [sic] for dismissal shown. I'll look at this later tonight and tomorrow, but please share your thoughts in the meantime." CP at 1087. McNeil replied to Krug: "Gary: [t]he CBA covers both progressive discipline and just cause. Has this faculty person been disciplined before?" CP at 1089. From this point on, Gary McNeil assumed a leadership role in Doron's case.

On February 11, 2011, WEA's Gary McNeil e-mailed UFE's Gary Krug with his assessment that "[t]ermination is a stretch. We could grieve progressive discipline. The remedy would probably have to include an improvement plan. . . . The union does not have to file a grievance. We have to deliberate the case, not decide anything on personalities." CP at 1092-93. McNeil later declared:

42

In an email dated February 11, 2011, I outlined the various issues that were associated with the letter dated February 7, 2011 that Dr. Fuller wrote to Dr. Doron informing him that he had rejected the conditions of his reappointment by refusing to participate in the development of an improvement plan. This email only contained my initial impressions of Dr. Fuller's letter. Although I stated in the e-mail that "Termination is a stretch", we later determined that Dr. Doron had refused to accept the offer of reappointment EWU made to him because he refused to agree to participate in the development of an improvement plan. Therefore, he had not been terminated and a grievance was not warranted because he had refused to accept EWU's offer of employment.

CP at 2695.

On February 16, 2011, Gary Krug informed Michael Doron that "UFE is requesting from EWU administration all documents relevant to their decision. We will review these regarding procedures of just cause, discipline, dismissal and related matters." CP at 1095.

On March 11, 2011, WEA's Gary McNeil e-mailed UFE President Gary Krug and UFE Grievance Chair Elizabeth Kissling. McNeil wrote:

I spoke with a WEA attorney on this issue today. His initial reaction to the situation is as follows:

1. Get Doron to accept the contract; management has the right to terminate him for not agreeing to the proposed contract. Without a contract, no work. Doron's refusal does not leave a status quo FAP—it leaves him without a contact.

2. If he signs, then there is the matter of the improvement plan. We could pursue grieving the actual improvement plan that is devised or initiate meetings with Fuller to explore ways to have a coherent FAP/improvement plan. Can an improvement plan become a new FAP—is that doable? Of course, Professor Doron would have to agree to work with this reality.

3. Now my reflections. Management does have a solid argument. He is in probationary status. They have the right under the CBA to offer a contract with an improvement plan.

4. Crafting an improvement plan based on a flimsy FAP does produce a problem. If Professor Doron wants to work at EWU, he will have to see the opportunity to work here by crafting a plan that re-writes the FAP. His one solid point is that how you can have specifics in an improvement plan when there are little specifics in the FAP. Of course, if you want a job, you can bend a good bit.

5. So we meet with him and tell him the "facts on the ground." His argument—no need for an improvement plan—does not recognize that he is an [sic] probationary employee working on probationary contracts.

Comments?

CP at 1102. Michael Doron claims this e-mail conveys "advice from the WEA to UFE that EWU Provost Fuller had the authority under the CBA to 'conditionally' reappoint Doron, and terminate Doron's reappointment if Doron does not accept an improvement plan." Br. of Appellant at 27.

On March 16, 2011, Gary McNeil, Elizabeth Kissling, and Michael Doron met to draft a "Counter-Improvement Plan" as a gesture of good faith. McNeil presented the plan to Carol Hawkins, in EWU's human resources department, and Laurie Connelly, an Assistant Attorney General representing EWU. McNeil discussed the plan with Rex Fuller over the phone. Fuller found the plan "lacking," because he thought it did not address the shortcomings identified previously.

On March 17, 2011, Hawkins e-mailed McNeil:

Thank you for meeting with Laurie Connelly and I yesterday to discuss and review the proposal you dropped off on behalf of Michael Doron. Laurie and I met with Provost Fuller this morning and discussed it

44

with him. He has conferred with the Dean and Department Chair, and after careful consideration, he has determined to proceed with the nonrenewal. Please let me know if I can provide any additional information or assistance.

CP at 1120. In his deposition, Michael Doron admitted that his employment came to an end because he rejected the improvement plan offer, not because he was disciplined or terminated.

On April 16, 2011, Michael Doron received an offer to teach at California Southern University at Northridge, which he accepted. Doron's employment with EWU ended June 15, 2011.

## PROCEDURE

On June 27, 2011, Michael Doron filed suit against EWU, UFE, United Faculty of Washington State, WEA, Arsen Djatej, Susan Megaard, Duanning Zhou, and Elizabeth Murff. Doron claimed that EWU violated the collective bargaining agreement and the covenant of good faith. He claimed that EWU wrongfully discharged him in violation of public policy, wrongfully withheld wages, and is liable in promissory estoppel. Doron alleged UFE breached its obligation of fair representation. He contended that United Faculty of Washington State and the WEA interfered with his business expectancies. Finally, Michael Doron alleged Arsen Djatej, Susan Megaard, Duanning Zhou, and Elizabeth Murff defamed him.

45

Michael Doron amended his complaint on September 24, 2012. The amendment added a claim for disability discrimination against EWU, UFE, and Department Chair Elizabeth Murff. The amendment also added Provost Rex Fuller and Dean of Business School Niel Zimmerman as defendants for purposes of the disability discrimination claim.

Over a period of three months, the court granted dismissal, on summary judgment, of all claims asserted by Michael Doron against all defendants. In turn, the trial court denied Michael Doron's motion for summary judgment. On appeal, Doron does not challenge the dismissal of his claims for defamation or disability discrimination.

## LAW AND ANALYSIS

### *Breach of Contract*

The target of Michael Doron's breach of contract claim is EWU and the claim is based on the collective bargaining agreement between his union, UFE, and the university. Washington courts apply contract law to interpret collective bargaining agreements. *Navlet v. Port of Seattle*, 164 Wn.2d 818, 842, 194 P.3d 221 (2008). In construing a written contract, the basic principles require that (1) the intent of the parties controls, (2) the court ascertains the intent from reading the contract as a whole, and (3) a court will not read an ambiguity into a contract that is otherwise clear and unambiguous. *Mayer v. Pierce County Med. Bureau, Inc.*, 80 Wn. App. 416, 420, 909 P.2d 1323 (1995). This court interprets an agreement in a manner that gives effect to all the contract's provisions.

46

*Nishikawa v. U.S. Eagle High, LLC*, 138 Wn. App. 841, 849, 158 P.3d 1265 (2007). Interpretation of a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence. *Tanner Elec. Co-op. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996).

Michael Doron asserts EWU violated the CBA in four respects. First, EWU had no prerogative to reappoint him "contingent" on an improvement plan under the CBA. Second, he had no obligation to formally accept or reject reappointment and thus EWU could not terminate his employment because he failed to respond to the December 1, 2010 reappointment letter. Third, the December 1, 2010 reappointment letter did not require him to accept the reappointment for it to become effective. The second and third arguments run together. Fourth, EWU could not terminate his employment without following the CBA's disciplinary process. Unambiguous terms of the CBA defeat Doron's contentions.

Under section 5.3.1 of the CBA, a faculty member's annual review results in one of four options, one option which is the member continuing on probationary status with an improvement plan. Doron provides no testimony that the CBA was intended by the parties to mean other than what it says.

Under section 5.6 of the CBA, a faculty member must accept reappointment or notify EWU of his or her intent to resign. Subsection 5.6.2 demands that the

47

reappointment letter be signed by the appointee and returned to the Chief Academic Officer within fifteen (15) days of its receipt to indicate the appointee's acceptance of the conditions of appointment. Thus, EWU followed the contract, rather than breached it, when demanding that Michael Doron accept in writing his reappointment on the condition of preparing an improvement plan.

Michael Doron emphasizes that his December 1, 2010 reappointment letter did not inform him that he needed to accept reappointment. But the law does not require an employer to remind the employee of the terms of a collective bargaining agreement.

Michael Doron contends an issue of fact as to whether he rejected the reappointment offer precludes a summary judgment ruling. The undisputed evidence, however, is to the contrary. EWU offered Michael Doron reappointment with an improvement plan twice, and Doron twice rejected the offer. Doron first rejected reappointment when he e-mailed Elizabeth Murff on January 5, 2011, stating: "I will not participate in this process and will not agree to any changes to my FAP." CP at 822. Doron later testified that he understood the December 1, 2010 reappointment letter as a conditional offer of employment, which he implicitly rejected with his January 5, 2011 e-mail. After the deadline for developing an improvement plan passed, EWU extended Doron "one last opportunity to develop an improvement plan." CP at 413. Doron again responded, "Let me save you the time: I will not participate in this process, and will not agree to any changes to my approved FAP or Faculty Workload." CP at 425.

48

In repeatedly rejecting the conditions of his reappointment, Michael Doron emphasized his belief that EWU cannot unilaterally modify his faculty activity plan. In this lawsuit, he advocates this belief by arguing any insistence that he amend his FAP violated the CBA. In fact, on November 24, 2010, Elizabeth Murff requested a modification to Michael Doron's FAP by March 18, 2011. She cited the CBA section that allowed amendments to the plan.

Two provisions of the CBA promote Michael Doron's argument and cause us caution when affirming the trial court. Section 5.3.1(a) reads, in part, that "[i]t is expected that the FAP will be in effect throughout the probationary period unless modified by *mutual agreement between the faculty member*, chair, personnel committee, dean, and Chief Academic Officer." CP at 242-43 (emphasis added). The term "mutual agreement" is strong language in favor of Doron. Section 7.3.3(a) of the CBA, under which any agreed amendments or revisions to the FAP made as a result of the collaborative development process must be signed by the faculty member, promotes Michael Doron's argument and causes us further caution when affirming the trial court.

Other sections of the collective bargaining agreement suggest the administration may demand a change in the FAP and only administration members need approve the changes. Section 7.3.5 of the CBA states: "FAPs may be modified during their term. A faculty or the chair may request in writing a modification. All modifications are subject to the same approval process as the original FAP." CP at 252. Section 7.3.4 requires

49

approval of a FAP by the department personnel committee, the department chair, the school dean, and the Chief Academic Officer. The section does not speak of approval by the faculty member. Although development of the FAP is a collaborative process, and the FAP must be signed by the faculty member, section 7.3.3 rests ultimate decision making authority with the Chief Academic Officer.

We need not resolve whether the CBA requires approval by the faculty member of a modification to his FAP, since we find this resolution unimportant to resolving the appeal. In the reappointment letter, EWU did not demand a change in the FAP. The school, instead, demanded an improvement plan. Although Michael Doron resisted an improvement plan on the ground that he did not desire a change or only desired limited change in the FAP, the two plans are separate. An improvement plan could be entered without impacting the FAP. Michael Doron may have had the right to resist any change in the FAP, but he had no right, under the CBA, to ignore EWU's demand for an improvement plan. The undisputed facts show Doron rejected a legitimate offer of retention from EWU.

Michael Doron's argument that EWU violated the disciplinary provisions of the CBA hinges on his view that Rex Fuller's reappointment letter could not and was not conditioned on an improvement plan, that he need not expressly accept the reappointment, and thus he had a vested right to his professorship the following year. Therefore, according to Doron, any dismissal needed to follow the disciplinary provisions

in the CBA. Our prior analysis shows that Doron's underpinnings for this argument render it unsound. EWU possessed the prerogative to reappoint on condition of an improvement plan and Michael Doron was obligated to accept in writing the reappointment.

Michael Doron terminated his employment by failing to accept in writing the reappointment. He was not discharged as a matter of discipline. In his deposition, Doron admitted that his employment came to an end because he rejected the improvement plan offer, not because he was disciplined or terminated. Article 13 applies in situations of discipline and discharge for cause, not in Doron's circumstances. Instead section 5.3 of the agreement addresses retention of probationary faculty.

Even viewing the facts in a light most favorable to Michael Doron, Eastern Washington University did not violate its collective bargaining agreement with the UFE in this case. Since we so hold, we need not address EWU's argument that Doron's suit is barred because of his failure to exhaust his contractual grievance remedies.

*Promissory Estoppel*

Michael Doron next assigns error to the trial court's dismissal on summary judgment of his claim for promissory estoppel against EWU. Doron contends that EWU Provost Fuller and Professor Djatej promised Doron, during the hiring process, that Doron could meet any academic research requirements and be successful at EWU with Djatej's help by allowing Doron to coauthor with Djatej. Doron argues that the promise

51

was broken when Djatej transferred to another university and did not coauthor with him. After Djatej returned to EWU, Doron met with AIS Department Chair Elizabeth Murff and Djatej to discuss their concerns in his second annual evaluation, and Doron offered to coauthor academic papers with Djatej, but Doron's suggestions were ignored. Doron further contends that, when accepting EWU's offer, he rejected other job offers and moved to Spokane based on the promises of Djatej and Fuller. According to Michael Doron, EWU walked away from its promise to help Doron succeed in meeting his academic research requirements when EWU Provost Fuller withdrew Doron's reappointment.

In response, EWU contends Michael Doron's promissory estoppel claim fails, as a matter of law for four reasons. First, no specific promise, let alone an enforceable promise, was given to Michael Doron. Second, Doron could not rely on any promise because of a provision in the CBA warning a faculty member that any oral promises are not binding. Third, Arsen Djatej had no authority to bind EWU to a promise. Fourth, a party may not recover in promissory estoppel when a written contract controlled the parties' relationship. We agree with EWU's first argument and thus do not address the remaining contentions.

Promissory estoppel relates to promises which have no contractual basis in that there was no bargain. *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 261 n.3, 616 P.2d 644 (1980). The purpose of promissory estoppel is to make a promise

binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange. *Klinke*, 94 Wn.2d at 261 n.4. The doctrine of promissory estoppel was developed to cover certain circumstances in which consideration is lacking, but the enforcement of the promise is appropriate because the promisor should expect the promise to induce detrimental reliance on the part of the promisor. *Hatfield v. Columbia Fed. Savs. Bank*, 57 Wn. App. 876, 885, 790 P.2d 1258 (1990). The doctrine of promissory estoppel, unlike equitable estoppel, can be used as a "sword" in a cause of action for damages. *Klinke*, 94 Wn.2d at 259; *Flower v. T.R.A. Indus. Inc.*, 127 Wn. App. 13, 31, 111 P.3d 1192 (2005).

In Washington, promissory estoppel has five elements:

> "(1) [a] promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise."

*Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 171-72, 876 P.2d 435 (1994) (quoting *Klinke*, 94 Wn.2d at 259 n.2)

Obviously, promissory estoppel requires a promise. *Elliott Bay Seafoods, Inc. v. Port of Seattle*, 124 Wn. App. 5, 13, 98 P.3d 491 (2004). "A promise is 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Elliot Bay Seafoods*,

*Inc.*, 124 Wn. App. at 13 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (1981)).

Not every promise qualifies for promissory estoppel. "A statement of future intent is not sufficient to constitute a promise for the purpose of promissory estoppel. An intention to do a thing is not a promise to do it." *Elliot Bay Seafoods*, 124 Wn. App. at 13. Importantly, promissory estoppel requires the existence of a promise that is "clear and definite." *Havens*, 124 Wn.2d at 173. Another necessary condition is that the promise be worded consistently with an intent for it to be enforceable. *Wash. Educ. Ass'n v. Wash. Dep't of Ret. Sys.*, 181 Wn.2d 212, 225, 332 P.3d 428 (2014); *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1001 (7th Cir. 2000) (applying Indiana law); *Bouwens v. Centrilift*, 974 P.2d 941, 947 (Wyo. 1999); *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 204 (Iowa 1997). The condition is similar in nature to promissory estoppel's element that the speaker should reasonably expect that the promisee change his or her position based on a promise.

Under Michael Doron's version of the facts both Arsen Djatej and Rex Fuller "promised" that Djatej would coauthor publications with Doron and thereby assist Doron in fulfilling his publishing requirements. Nevertheless, Doron points to no specific time or date when an express promise was made. Doron repeatedly conceded he heard no specifics of any promise. He does not provide testimony as to the specific words used so

54

that one could conclude that the terms and contexts showed an intent to render a binding promise.

Rex Fuller and Arsen Djatej characterize their speech as leading to a general understanding rather than specific promises. Fuller's, Djatej's, and Doron's understanding never rose above general statements of intent of conduct in the future. Arsen Djatej never offered or identified a specific research project Michael Doron could coauthor with him. Doron testified that they "never set explicit terms." CP at 1459. Doron's claim would command more attention if he had facts that he explained to Djatej and Fuller that he might reject other offers of employment upon an assurance by the two that Djatej would commit to coauthoring one or more articles and, in response, one or both expressly stated that Djatej would copublish a certain article by a set date in order to fulfill Doron's publishing requirements. But even then, the promise is in the nature of future intent.

The law has not provided definitive guidelines for determining what promises are enforceable in promissory estoppel. Therefore, we look to analogous cases for guidance.

We believe the Washington case most helpful in resolving EWU's summary judgment motion is *Elliott Bay Seafoods, Inc. v. Port of Seattle*, 124 Wn. App. 5, 98 P.3d 491 (2004). The Port adopted a comprehensive scheme of harbor improvements including the redevelopment of Pier 66 as a "mixed-use" or working fishing pier that would include a maritime museum, conference center, fish processing, boat moorage,

55

cruise ship terminal and various retail facilities. The port envisioned the pier becoming a tourist attraction similar to Fisherman's Wharf in San Francisco. In response to the port's announcement and plans, Elliott Bay Seafoods signed a lease for office space for its fish retail business at Pier 66. Before signing the lease, Port officials told Elliott that plans for the redevelopment of the pier included a working fishing pier concept. The Port informed Elliott that it was in final negotiations with a business for an interactive exhibit space as well as actual fish processing. Elliott then spent $400,000 constructing its store and purchasing necessary equipment and appliances and opened its retail store. The expected mixed-uses for other portions of the pier did not materialize to the detriment of Elliott and Elliott sought to recover damages in promissory estoppel. This court affirmed the trial court's grant of summary judgment to the port on the ground of a lack of genuine issues of material fact, since the port made no promise. "What the parties hoped would happen simply did not. That unfortunate turn of events does not support the claims asserted." *Elliott*, 124 Wn. App. at 8.

*Havens* also supports affirmation of the summary judgment order in favor of EWU. 124 Wn.2d at 174. The employer rendered many interview statements upon which the employee staked a claim for promissory estoppel. The court considered the statements as typical of those often made in the interviewing process, such as what it would take to get the plaintiff to leave his present job and statements relating to the nature of the job for which he was hired.

56

We may fault EWU for failing to warn Michael Doron of the impending departure of Arsen Djatej and Djatej's failure to timely reply to Doron's fall 2009 request for assistance. But no express promise was made to Doron of Djatej's remaining in employment with EWU, and faculty members sometimes move. What the parties initially expected to happen did not come to fruition, but expectations do not suffice for promissory estoppel.

### *Wrongful Termination*

Michael Doron next assigns error to the trial court's dismissal on summary judgment that he was discharged in violation of public policy. He claims that EWU fired him for exercising his rights under the collective bargaining agreement and public policy dictates that an employee be able to protect his bargained rights.

To prevail on a claim of wrongful discharge, a plaintiff must show: (1) the existence of a "clear public policy" ("clarity" element), (2) whether discouraging the conduct in which the employee engaged would jeopardize the public policy ("jeopardy" element), (3) whether the conduct caused the discharge ("causation" element), and (4) whether the employer offers an overriding justification for the discharge ("absence of justification" element). *Piel v. City of Fed. Way*, 177 Wn. 2d 604, 610, 306 P.3d 879 (2013) (quoting *Gardner v. Loomis Armored, Inc.*, 128 Wn. 2d 931, 941, 913 P.2d 377 (1996)). Implicit in the cause of action is that the employer discharges the employee or

the employee shows a constructive discharge. *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 121 Wn. App. 295, 315, 316, 88 P.3d 966 (2004).

Doron's claim fails because, as discussed above, EWU did not discharge him. The undisputed facts are that EWU reappointed Michael Doron on the condition of an improvement plan and Doron rejected the reappointment. Doron does not allege constructive discharge.

Doron emphasizes that he twice asserted that modifying his FAP would violate the CBA, on December 21, 2010 and January 5, 2011. Assuming, without deciding, a breach of agreement, EWU still retained the prerogative to insist on an improvement plan. Doron inconsistently expressed acceptance and rejection of an improvement plan, but, more importantly, never signed the reappointment letter. Upon signing the reappointment letter, he could have stated that he was not agreeing to a change in his FAP.

The trial court did not err when it dismissed on summary judgment Michael Doron's claim for wrongful termination.

*Duty of Fair Representation*

Michael Doron assigns error to the trial court's dismissal on summary judgment of his claim that UFE breached its duty of fair representation.

The federal courts created the doctrine of a union's duty of fair representation. The duty of fair representation evolved as a judicial response to the broad power granted

to unions, under the National Labor Relations Act (NLRA), 29 U.S.C. § 159(a). *Steele v. Louisville & Nashville R.R.*, 323 U.S. 192, 65 S. Ct. 226, 89 L. Ed. 173 (1944); *Peterson v. Kennedy*, 771 F.2d 1244, 1253 (9th Cir. 1985). That duty extends to "*all* the employees in such unit. . . ." 29 U.S.C. § 159(a) (emphasis added). The duty of fair representation exists because a single labor organization represents the interests of all employees within a unit, and "if individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the representative organization to 'serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 n.14, 103 S. Ct. 2281, 76 L. Ed. 2d 476 (1983) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967)).

Michael Doron was a state employee and thus Washington law controlled his relationship with his union. Washington law echoes federal law. RCW 41.56.080, like 29 U.S.C. § 159(a), contains a provision that grants the union the power of exclusive representation. The statute reads:

> The bargaining representative which has been determined to represent a majority of the employees in a bargaining unit shall be certified by the commission as the exclusive bargaining representative of, and shall be required to represent, all the public employees within the unit without regard to membership in said bargaining representative . . .

In *State ex rel. Washington. Federation of State Employees, AFL-CIO v. Board of*

*Trustees of Central Washington University*, 93 Wn.2d 60, 67, 605 P.2d 1252 (1980), our high court observed that where Washington's Public Employees Collective Bargaining Act, ch. 41.56 RCW is substantially similar to the NLRA, decisions under that act, while not controlling, are persuasive. *See also Public Empl. Relations Comm'n v. Kennewick*, 99 Wn.2d 832, 664 P.2d 1240 (1983).

The burden of proving a breach of the duty of fair representation is on the plaintiff. *Vaca*, 386 U.S. at 193; *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 879 (9th Cir. 2007). A reviewing court affords substantial deference to the union's determination not to represent a member because the union must balance the individual interests against the collective interests. *Schmidtke v. Tacoma Sch. Dist. No. 10*, 69 Wn. App. 174, 181, 848 P.2d 203 (1993). In accordance with the broad discretion traditionally owed to unions, courts do not scrutinize the quality of a union's decisions. *Slevira v. Western Sugar Co.*, 200 F.3d 1218, 1221 (9th Cir. 2000); *Muir v. Council 2 Wash. State Council of County & City Emp., Local 1849*, 154 Wn. App. 528, 533, 225 P.3d 1024 (2009).

The duty of a union is dissimilar to the duty of an attorney whose obligation lies solely to one discrete client. The collective bargaining system of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit. *Allen v. Seattle Police Officers' Guild*, 100 Wn.2d 361, 370, 670 P.2d 246 (1983).

"A union breaches its duty of fair representation when its conduct is discriminatory, arbitrary, or in bad faith." *Muir*, 154 Wn. App. at 531. On appeal, Michael Doron does not argue that UFE's conduct was discriminatory. He argues the union's conduct was arbitrary and in bad faith. "Conduct can be classified as arbitrary 'only when it is irrational, when it is without a rational basis or explanation.' This deferential standard for arbitrary conduct 'gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong.'" *Beck*, 506 F.3d at 879 (citations omitted). "To establish that the union's exercise of judgment was in bad faith, the plaintiff must show 'substantial evidence of fraud, deceitful action or dishonest conduct.'" *Beck*, 506 F.3d at 880 (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of Am. v. Lockridge*, 403 U.S. 274, 299, 91 S. Ct. 1909, 29 L. Ed. 2d 473 (1971)). A union's conduct constitutes an exercise of judgment entitled to deference even when the union's "judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46, 119 S. Ct. 292, 142 L. Ed. 2d 242 (1998).

Michael Doron first argues that UFE breached his duty of fair representation when UFE President Gary Krug insisted that Doron modify his FAP. Viewing the evidence in a light most favorable to Michael Doron, it could be said that UFE President Gary Krug repeatedly failed to represent Doron's interests. For Krug's conduct to be actionable, however, it would have to be arbitrary or in bad faith. There is no evidence that Krug acted without a rational basis or explanation or engaged in fraud, deceitful action or

61

dishonest conduct. Krug's conduct was motivated by a desire to create a FAP sufficient in detail to base judgments of teaching performance and consistent with other faculty FAPs. In deference to Krug and UFE, this ground was rational. Krug needed to balance individual interests against the collective interests of the union and its many members. Krug also believed Michael Doron would be better served by a modified FAP.

Michael Doron expressed his disappointment with Krug because, at the November 18, 2010 meeting, Krug stated he represented "everyone's interests." CP at 1058. Krug appropriately responded that the UFE represents and enforces the contract and that all members of bargaining unit receive equal protection and advice regarding the enforcing of the contract. Doron and Krug's relationship quickly soured. But Doron lacks evidence that Gary Krug acted in bad faith.

Michael Doron next argues that UFE breached its duty of fair representation when it failed to grieve his termination. As discussed above, EWU did not terminate Doron. Even in a light most favorable to Doron, the evidence shows that UFE discharged its duty to investigate the possibility of grieving his dispute.

The duty of fair representation prohibits a union from ignoring a meritorious grievance or processing that grievance perfunctorily. *Lindsey v. Mun. of Metro. Seattle*, 49 Wn. App. 145, 149, 741 P.2d 575 (1987). But a union has no duty to arbitrate every grievance; it may screen its members' grievances and process only those it determines have merit. *Muir*, 154 Wn. App. at 531-32. A union satisfies its duty of fair

representation if it conducts at least a minimal investigation into the merits of the grievance. *Lindsey*, 49 Wn. App. at 150. "A union's duty requires some minimal investigation of employee grievances, the thoroughness depending on the particular case; only an egregious disregard for union members' rights constitutes a breach of the union's duty." *Muir*, 154 Wn. App. at 532 (internal quotation marks and citations omitted). A union's conduct may not be deemed arbitrary simply because of an error in evaluating the merits of a grievance or in interpreting particular provisions of a collective bargaining agreement. *Peterson*, 771 F.2d at 1254; *Muir*, 154 Wn. App. at 533.

In *Muir*, this court reversed the trial court's denial of the union's summary judgment motion and directed that summary judgment be granted the union. The undisputed evidence showed that the union investigated, deliberated, and provided a rational reason for declining Muir's demand to file a grievance concerning the amount of his pay. In *Schmidtke*, 69 Wn. App. 174, this court affirmed a summary judgment dismissal in favor of the union. The union reasonably concluded that its member's grievance lacked merit.

On February 9, 2011, Michael Doron forwarded Rex Fuller's February 7 message to UFE President Gary Krug, writing: "The university has terminated me effective June for not writing a new FAP. This is something the union will have to act on. Let me know." CP at 1087. Krug forwarded Doron's e-mail to WEA's Gary McNeil, writing: "Have the procedural, contractual steps been followed here? Is just causes [sic] for

dismissal shown. I'll look at this later tonight and tomorrow, but please share your thoughts in the meantime." CP at 1087. McNeil replied to Krug: "Gary: The CBA covers both progressive discipline and just cause. Has this faculty person been disciplined before?" CP at 1089. WEA's Gary McNeil e-mailed UFE's Gary Krug with his assessment that "[t]ermination is a stretch. We could grieve progressive discipline. The remedy would probably have to include an improvement plan. . . . The union does not have to file a grievance. We have to deliberate the case, not decide anything on personalities." CP at 1092-93. Krug informed Doron that "UFE is requesting from EWU administration all documents relevant to their decision. We will review these regarding procedures of just cause, discipline, dismissal and related matters." CP at 1095. Congruent with its duties, UFE thus promised Doron to investigate the dispute for violations of the CBA. Through that investigation, as Gary McNeil testified,

> [UFE] determined that Dr. Doron had refused to accept the offer of reappointment EWU made to him because he refused to agree to participate in the development of an improvement plan. Therefore, he had not been terminated and a grievance was not warranted because he had refused to accept EWU's offer of employment.

CP at 2695. The evidence cannot be construed to show that UFE ignored Doron's plight or processed his request for action in a perfunctory manner.

The trial court did not err when it dismissed Michael Doron's claim for breach of the duty of fair representation on summary judgment.

*Tortious Interference with Business Expectancy*

Michael Doron assigns error to the trial court's dismissal on summary judgment of his claim that WEA tortiously interfered with Doron's business expectancies with UFE. In Washington, tortious interference with a business expectancy has five elements:

> (1) there exists a valid contractual relationship or business expectancy, (2) the defendant had knowledge of the same, (3) the defendant's intentional interference induced or caused a breach or termination of the relationship or expectancy, (4) the defendant's interference was for an improper purpose or by improper means, and (5) the plaintiff suffered damage as a result.

*Evergreen Moneysource Mort. Co. v. Shannon*, 167 Wn. App. 242, 258, 274 P.3d 375 (2012) (citing *Pleas v. City of Seattle*, 112 Wn.2d 794, 800-05, 774 P.2d 1158 (1989)).

A cause of action for tortious interference arises from either the defendant's pursuit of an improper objective of harming the plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships. *Pleas*, 112 Wn.2d at 803-04. A claim for tortious interference is established when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. *Pleas*, 112 Wn.2d at 804. Plaintiff must show not only that the defendant intentionally interfered with his business relationship, but also that the defendant had a duty of noninterference; i.e., that he interfered for an improper purpose or used improper means. *Pleas*, 112 Wn.2d at 804.

A complete failure of proof concerning any element necessarily renders all other facts immaterial. *Janaszak v. State*, 173 Wn. App. 703, 727, 297 P.3d 723 (2013). The plaintiff must show that the defendant's interference induced or caused a breach. *Hoffer v. State*, 110 Wn.2d 415, 433, 755 P.2d 781 (1988), *reconsidered in part*, 113 Wn.2d 148, 776 P.2d 963 (1989); *Burkheimer v. Thrifty Inv. Co.*, 12 Wn. App. 924, 927, 533 P.2d 449 (1975); *Holman v. Coie*, 11 Wn. App. 195, 215, 522 P.2d 515 (1974).

Michael Doron generally contends that WEA employee Gary McNeil's advice to Krug improperly interfered with UFE's duty of fair representation owed to Doron. We question whether Doron shows any conduct of WEA to be improper, but we do not rest our decision on this ground. UFE did not breach its duty of fair representation. Therefore, Doron cannot show any conduct of WEA that caused a breach of contract.

Without further analysis, Michael Doron also argues, in one sentence in his opening brief, that WEA also induced EWU to violate the CBA. We previously ruled that EWU did not violate the CBA. Thus, Doron's additional argument must also fail.

The trial court did not err when it dismissed Michael Doron's tortious interference claim on summary judgment.

### Attorney Fees and Costs

Michael Doron asks for attorney fees and costs on appeal. Since Doron does not prevail, we decline an award. RAP 18.1; RCW 49.48.030.

No. 31636-0-III
*Doron v. Eastern Washington Univ.*

CONCLUSION

We affirm the trial court's grant of summary judgment dismissing all claims against EWU, UFE, and WEA.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

WE CONCUR:

Brown, A.C.J.

Lawrence-Berrey, J.